**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

LATCHABLE, INC., LOCAL ENERGY
TECHNOLOGIES, LLC, LUKE SCHOENFELDER,
BRIAN JONES,

*Plaintiffs*,

v.

BEN STEINER, LET INVESTORS GROUP, LLC,
NOAH SIEGEL, JONATHAN HIRSCH, NICHOLAS
HIRSCH, GERARD JEFFREY,

*Defendants*.

</td></tr>
</table>

CIVIL ACTION NO.: 19-cv-7575

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Latchable, Inc. ("Latch"), Local Energy Technologies, LLC ("LET"), Luke

Schoenfelder, and Brian Jones (collectively, the "Plaintiffs"), by and through their undersigned

counsel, bring this action against Defendants Ben Steiner, LET Investors Group, LLC

("LETIG"), Noah Siegel, Jonathan Hirsch, Nicholas Hirsch, and Gerard Jeffrey (collectively, the

"Defendants"), and hereby allege as follows:

## INTRODUCTION

1.      From 2008 to 2013, Defendants Siegel, J. Hirsch, and N. Hirsch were involved in

a pattern of racketeering activity and the collection of unlawful debts as members and associates

of a criminal enterprise called the "Nahmad-Trincher Organization."  Defendant Siegel (a.k.a.,

the "Oracle") was one of the leaders of that criminal organization.

2.      Defendants Siegel, J. Hirsch, and N. Hirsch received income derived from the

Nahmad-Trincher Organization's unlawful activities, and in July 2012, they, along with

Defendants Steiner, Jeffrey, and LETIG, conspired to invest and invested at least a part of such

income in Plaintiff LET, in violation of §§ 1962(a) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), codified as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961-1968.

3.      RICO was enacted to protect legitimate interests from infiltration by organized crime—i.e., to protect entities just like LET, a company Mr. Schoenfelder formed after he traveled to Haiti in the wake of the devastating 2010 earthquake and recognized an urgent need to address energy distribution infrastructure deficiencies in developing markets.

4.      In April 2013, three principals of the Nahmad-Trincher Organization, Defendants Siegel, J. Hirsch, and N. Hirsch, were indicted and charged with numerous crimes.  Those criminal indictments, which would lead to convictions against Defendants Siegel, J. Hirsch, and N. Hirsch, the associated civil conspiracy, and Defendants' attempt to infiltrate LET, were the direct and proximate cause of the commercial failure of LET because LET could not raise necessary capital to continue operations after Defendants' attempt to unlawfully infiltrate and launder money through LET.  On January 31, 2014, LET's corporate registration lapsed, and LET was cancelled by the Virginia Secretary of State.

5.      On information and belief, Defendants Steiner and Jeffrey were aware of Defendants Siegel, J. Hirsch, and N. Hirsch's unlawful activities but did nothing to stop them and failed to inform LET and Mr. Schoenfelder of such unlawful activities.  Defendants' criminal activities and associated civil conspiracy injured LET and Mr. Schoenfelder.

6.      In conjunction with its investment in LET, LETIG entered into a valid and enforceable Subscription Agreement.  LETIG breached that Subscription Agreement at least because LETIG falsely represented to LET that its investment derived from real estate investments and sales, rather than the Nahmad-Trincher Organization's criminal activities.

7.     Over four and half years after LET's corporate registration was cancelled, and after Latch achieved success in the market, LETIG began a campaign to shake down Latch and wrongfully lay claim to some of Latch's technology and value.

8.     On November 30, 2018, LETIG—driven by Defendant Steiner—sent Latch and LET letters containing baseless allegations of wrongdoing, including allegations that Mr. Schoenfelder, Mr. Jones, and Latch misappropriated trade secrets.

9.     LETIG's letters threatened litigation, and they, along with subsequent letters, certain tolling agreements, and LETIG's notice of termination of its tolling agreement with Latch, have created an actual, substantial, and immediate controversy warranting the issuance of declaratory judgments.

10.    Latch, Mr. Schoenfelder, and Mr. Jones seek declarations from this Court that they did not misappropriate trade secrets.  There is no overlap between LET's energy distribution infrastructure technology and Latch's technology, which provides an access control platform and system for multi-unit buildings that allows building owners to manage access across their properties and residents to unlock doors using smartphones, door codes, or keycards.  Contrary to what LETIG claims, Latch, Mr. Schoenfelder, and Mr. Jones never misappropriated any trade secrets.

## NATURE OF THE ACTION

11.    Latch, Mr. Schoenfelder, and Mr. Jones seek declarations from this Court that they did not misappropriate trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*, the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 *et seq.*, or New York law.

12.     LET and Mr. Schoenfelder bring claims against Defendants for RICO violations, specifically violations of 18 U.S.C. §§ 1962(a) and 1962(d).

13.     Defendants Siegel, J. Hirsch, N. Hirsch, and LETIG unlawfully received income derived from a pattern of racketeering activity and/or through the collection of unlawful debts, and used or invested, directly or indirectly, some or all of such income, or the proceeds of such income, to acquire an interest in LET, a commercial enterprise engaged in and conducting activities affecting interstate and foreign commerce, in violation of 18 U.S.C. § 1962(a).

14.     Separately, Defendants conspired to violate 18 U.S.C. § 1962(a), in violation of 18 U.S.C. § 1962(d).

15.     LET brings a claim for breach of contract against LETIG, which breached the Subscription Agreement it entered in conjunction with its investment in LET.

## PARTIES

16.     Plaintiff Latch is a Delaware corporation formed on February 5, 2014, with a principal place of business at 450 W. 33rd Street, 12th Floor, New York, New York 10001.

17.     Plaintiff LET was a limited liability company formed on January 31, 2012 and registered in the Commonwealth of Virginia.

18.     Plaintiff Luke Schoenfelder is an individual and resides in New York, New York. Mr. Schoenfelder was the Manager, Chairman, President, and CEO of LET. Mr. Schoenfelder is Latch's co-founder and CEO.

19.     Plaintiff Brian Jones is an individual and resides in New York, New York. Mr. Jones was employed by LET as a hardware consultant. Mr. Jones is Latch's co-founder and CTO.

20.     Defendant Steiner is an individual and, on information and belief, resides in New York, New York.

21.     Defendant Jeffrey is an individual and, on information and belief, resides in New York, New York.

22.     Defendant LETIG is a Delaware limited liability company formed on July 27, 2012 by, among others, Defendants Steiner, Siegel, J. Hirsch, N. Hirsch, and Jeffrey.

23.     Defendant Siegel is an individual and, on information and belief, resides in New York, New York.  As discussed below, on December 5, 2013, Defendant Siegel pled guilty to transmitting sports wagering information, in violation of 18 U.S.C. § 1084, a felony.  Defendant Siegel was sentenced to a term of probation for two years, under the supervision of the probation department for the Southern District of New York.

24.     Defendant J. Hirsch is an individual and, on information and belief, resides in Brooklyn, New York.  As discussed below, on December 4, 2013, Defendant J. Hirsch pled guilty to transmitting sports wagering information, in violation of 18 U.S.C. § 1084, a felony.  Defendant J. Hirsch was sentenced to a term of probation for two years, under the supervision of the probation department for the Southern District of New York.

25.     Defendant N. Hirsch is an individual and, on information and belief, resides in New York, New York.  As discussed below, on October 16, 2013, Defendant N. Hirsch pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  Defendant N. Hirsch was sentenced to a term of probation for two years, under the supervision of the probation department for the Southern District of New York.

## JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 2201-02 and

18 U.S.C. § 1964, and has jurisdiction over LET's breach of contract claim pursuant to 28 U.S.C.

§§ 1332 and/or 1367.

27.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391

because Defendants are subject to personal jurisdiction in this judicial district and one or more of

Defendants Steiner, Siegel, J. Hirsch, N. Hirsch, and Jeffrey reside in this district.

28.     Defendants, either on their own or through their agents, at the time of the

commission of the acts alleged herein, were found in, and/or transacted business in the State of

New York, and the causes of action which are the object of this Complaint arise out of business

transactions and specific acts that took place within this judicial district.

29.     Defendants, either on their own or through their agents, conspired to commit the

wrongful acts alleged in this Complaint within the State of New York and/or committed or

participated in the commission of those acts within the State of New York, purposefully directing

their wrongful acts toward this judicial district and causing in this district the violations of 18

U.S.C. §§ 1964(a) and (d) and breach of contract as set forth herein.

## FACTUAL BACKGROUND

**I.     LET's Formation And Promising Early Stages**

30.     Mr. Schoenfelder met Mr. Adam Walker in the summer of 2011.  Mr. Walker was

running a venture with other students at the Rochester Institute of Technology ("RIT"), utilizing

small-scale wind turbines and a small smart meter device.  Mr. Schoenfelder had previously

traveled to Haiti, following the devastating 2010 earthquake.

31.     Mr. Schoenfelder and Mr. Walker began discussions about forming a company

that could address energy distribution infrastructure deficiencies in developing markets.  On

January 31, 2012, Mr. Schoenfelder and Mr. Walker founded LET to pursue their shared goal of addressing these deficiencies.

32.     LET aimed to aid rural electrification efforts by providing hardware and software solutions that electricity-generating utilities could use in developing markets, to monitor electricity consumption, bill customers, and prevent energy theft.

33.     In the first half of 2012, LET continued to develop its technology and actively sought out early-stage individual investors in, among other places, Virginia, New York, and Washington, D.C.

34.     In June 2012, Mr. Schoenfelder and Mr. Walker were introduced to Defendants Steiner, Siegel, J. Hirsch, N. Hirsch, and Jeffrey.

35.     Defendants Steiner, Siegel, J. Hirsch, N. Hirsch, and Jeffrey agreed to collectively invest $100,000 in LET in exchange for 16,000 Class B units.

36.     To facilitate that investment, Defendants Steiner, Siegel, J. Hirsch, N. Hirsch, and Jeffrey registered LETIG with the Delaware Secretary of State, on July 27, 2012.

37.     On information and belief, Defendants Steiner, Siegel, J. Hirsch, N. Hirsch, Jeffrey, and LETIG agreed to draw their $100,000 investment from a bank account for a New York limited liability company called "HMS LLC."

38.     As the below reproduction of LET's July 31, 2012 Silicon Valley Bank statement

shows, LETIG's investment of $100,000 was wired to LET on July 30, 2012 from "HMS LLC":



```
SVB › Silicon Valley Bank                                   Statement of Account
A Member of SVB Financial Group


                                                PAGE     1
                              THIS STATEMENT DATE    7-31-12
                              LAST STATEMENT DATE    7-12-12
                              ACCOUNT NUMBER    3300887268

                              ENCLOSURE DEBITS             1


       LOCAL ENERGY TECHNOLOGIES, LLC
       1811 SOUTH AVE

       ROCHESTER NY 14620


            3300887268        ANALYSIS CHECKING

            PREVIOUS BALANCE      7-12-12            .00
            +DEPOSITS/CREDITS        1         100,000.00
            -CHECKS/DEBITS           1           2,900.00
            -SERVICE CHARGE                          .00
            CURRENT BALANCE                    97,100.00

     * - - - - - - - - - -DESCRIPTIVE TRANSACTIONS- - - - - - - - - - *
       DATE        TRACER  DESCRIPTION                       AMOUNT
       7-30          45    WIRE IN  120730B6B7HU3R018153    100000.00
                           201221206677;ORG HMS LLC;REF 8
                           1139800

     * - - - - - - - - - - - -CHECKS PAID- - - - - - - - - - - - *
       SERIAL #      DATE      AMOUNT   SERIAL #    DATE      AMOUNT
                   * 7-31     2900.00

          * - - - - - - - -DAILY BALANCE SUMMARY- - - - - - - - - *
          DATE     BALANCE    DATE     BALANCE   DATE     BALANCE
          7-12                7-30   100000.00   7-31    97100.00
```

Ex. A (highlighting added).

39.     HMS LLC was held out to Mr. Schoenfelder and LET as Defendant Siegel's

corporate account.  However, as discussed below, and on information and belief, HMS LLC was

actually a company that Defendant Siegel and others used to facilitate a pattern of unlawful

racketeering activities and the collection of unlawful debts, for a criminal enterprise called the

"Nahmad-Trincher Organization."  *See* Section II (below).  Mr. Schoenfelder and LET had no

knowledge regarding the source of HMS LLC funds or the unlawful activities of the Nahmad-

Trincher Organization.

40.     Mr. Jones joined LET as a hardware consultant in July 2012.

8

41.     On November 16, 2012, LET filed U.S. Provisional Patent Application No. 61/727,361, entitled "Service Providing System," with the U.S. Patent and Trademark Office.

42.     By 2013, LET was in need of additional financing to further fund its research and development, key personnel acquisitions, global deployments, and general operations.

43.     In April 2013, Mr. Schoenfelder was working to secure a Series A financing for LET. However, news broke that "shocked" LET:

> [T]he United States Attorney for the Southern District of New York; … the Assistant Director in Charge of the New York Office of the Federal Bureau of Investigation (FBI); … the Special Agent in Charge of the New York Field Office of the Internal Revenue Service, Criminal Investigation (IRS-CI); and … the Police Commissioner of the City of New York (NYPD), announced today the unsealing of charges against 34 alleged members and associates of two related Russian-American organized crime enterprises, including a Russian "Vor," for a range of offenses including the operation of at least two international bookmaking organizations—or "sportsbooks"—that catered to multi-millionaires and billionaires in the U.S., Russia, and the Ukraine. One enterprise, the Taiwanchik-Trincher Organization, run by VADIM TRINCHER, is alleged to have laundered tens of millions of dollars from Russia and the Ukraine through Cyprus and into the U.S. The other enterprise, the Nahmad-Trincher Organization, run by ILLYA TRINCHER, the son of VADIM TRINCHER, is alleged to have been financed by, among other entities, a prestigious art gallery in New York City.

Ex. B (https://archives.fbi.gov/archives/newyork/press-releases/2013/manhattan-u.s.-attorney-charges-34-members-and-associates-of-two-russian-american-organized-crime-enterprises-with-operating-international-sportsbooks-that-laundered-more-than-100-million); Ex. C (Apr. 27, 2013 email from LET's General Counsel to the FBI regarding the "Russian American Organized Crime Case"). Defendants Siegel, J. Hirsch, and N. Hirsch were named in the above-quoted press release and the criminal indictment. *See* Ex. B; *see also* Ex. D, *USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-9, D.I. 2 (S.D.N.Y. Apr. 11, 2013) (the "Indictment").

44.     The criminal activities of Defendants Siegel, J. Hirsch, and N. Hirsch, and the public disclosure of those activities, derailed Mr. Schoenfelder and LET's efforts to raise

necessary capital.  For example, on April 16, 2013, Defendant N. Hirsch failed to attend a major

meeting relating to LET's fundraising efforts.  His absence was attributed to a family emergency;

however, on information and belief, Defendant N. Hirsch's absence was in reality attributable to

an FBI raid of his and Defendant Hirsch's apartment.  The Defendants' criminal activities and

the effects of those activities are discussed more below.

## II.  Defendants Siegel, J. Hirsch, And N. Hirsch Are Indicted For Numerous Criminal Activities, Including Racketeering Activities And The Collection of Unlawful Debts, And Plead Guilty

45.     On April 11, 2013, Defendants Siegel, J. Hirsch, and N. Hirsch were among

thirty-four defendants named in a criminal indictment filed by the Manhattan U.S. Attorney in

the Southern District of New York.  Ex. D (Indictment).

46.     The Indictment stated that Defendant Siegel (a.k.a., "The Oracle") was a leader of

a criminal enterprise called the "Nahmad-Trincher Organization," and in that capacity,

participated in and profited from various crimes.  *Id.* ¶¶ 25-27, 33.

47.     The Indictment explained that Defendant Siegel and the Nahmad-Trincher

Organization's crimes affected interstate and foreign commerce and included conducting an

illegal gambling business, money laundering, and extortion.  *Id.* ¶¶ 25-26.

48.     According to the Indictment, the Nahmad-Trincher Organization ran a high-stakes

illegal gambling business out of New York City and Los Angeles that catered primarily to multi-

millionaire and billionaire clients.  *Id.* ¶ 28.  Through online gambling websites, operating

illegally in the United States, the Nahmad-Trincher Organization generated tens of millions of

dollars in wagers annually.  *Id.*

49.     With respect to Defendant J. Hirsch's participation in the unlawful activities of

the Nahmad-Trincher Organization, the Indictment explained that from 2006 through April 2013,

Defendants J. Hirsch and Siegel, and other members and associates of the Nahmad-Trincher

Organization, agreed to conduct and participate in multiple unlawful activities affecting interstate and foreign commerce, including the operation of an illegal gambling business, money laundering, the transmission of wagering information, interstate and foreign travel and transportation in aid of racketeering enterprises, the collection of extensions of credit by extortionate means, and multiple acts involving gambling.  *Id.* ¶¶ 39, 59-61.

50.    The Indictment also described Defendant N. Hirsch's unlawful conduct, stating that from around March 2012 to April 2013, he conspired to commit wire fraud when he and another member of the Nahmad-Trincher Organization "used interstate and international wires in furtherance of a scheme to defraud an individual concerning a sale of a piece of art that they claimed to be worth approximately \$300,000 but was in fact worth at least approximately \$50,000 less."  *Id.* ¶ 71.

51.    The Indictment stated that from around 2006 to April 2013, Defendant Siegel's Nahmad-Trincher Organization "laundered more than \$50,000,000 in gambling proceeds through various bank accounts and businesses" and a plumbing company in the Bronx, *id.* ¶¶ 29, 63, and "such financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of … unlawful activity" and involved "various bank accounts controlled by" members of the Nahmad-Trincher Organization, including Defendant Siegel, *id.* ¶¶ 65, 67.  For example, on or about June 4, 2011, Hillel Nahmad, another leader of the Nahmad-Trincher Organization, unlawfully caused \$850,000 to be sent from his father's bank account in Switzerland to a bank account under the control of Defendant Siegel.  *Id.* ¶ 48.

52.    "[T]he corporate name used by the Nahmad-Trincher Organization" was "***HMS Sports***."  Ex. E, *USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-10, D.I. 908 at 2 (S.D.N.Y. May

2, 2014) (J. Hirsch Sentencing Submission) (emphasis added).  And as the government explained in its sentencing submission for Mr. Nahmad, "an account in the name of HMS sports" was "controlled by Noah Siegel" and "used to operate the business" of the criminal Nahmad-Trincher Organization.  Ex. F, *USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-7, D.I. 871 at 3 (S.D.N.Y. Apr. 23, 2014).

53.     The government's sentencing submission for Defendant Siegel similarly explained that "the ***HMS Sports*** bank account, of which Siegel [wa]s the signatory … was used, in part, to pay out and collect debts to and from clients and split profits amongst members" of the Nahmad-Trincher Organization.  Ex. G, *USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-9, D.I. 796 at 6 (S.D.N.Y. Apr. 9, 2014) (emphasis added).

54.     As alleged above, the $100,000 investment LET received from LETIG came from an entity called "***HMS LLC***," which was held out as Defendant Siegel's corporate account.

55.     No entity beginning with the terms "HMS Sports" has been registered with the New York State Department of State Division of Corporations.  HMS LLC, however, is a registered New York limited liability company, and Defendant Siegel is the addressee of record for service of process for HMS LLC.

56.     On December 5, 2013, Defendant Siegel pled guilty to Count Ten of the Indictment, transmission of sports wagering information, in violation of 18 U.S.C. § 1084.  *See USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-9 (S.D.N.Y. Dec. 5, 2013) (docket: "Minute Entry for proceedings held before Judge Jesse M. Furman:  Plea entered by Noah Siegel (9) Guilty as to Count 10.").

57.     In conjunction with his guilty plea to Count Ten of the Indictment, Defendant Siegel admitted that "from 2008 to 2013, [he] helped a sports betting group by picking some

games for the group to bet on against bookmakers and fellow bettors.  However, at a point the group accepted some bets from a small number of bettors," and "[i]n connection with those bets, [he] received wire communications when [he] was in Manhattan that came from outside of New York State."  Ex. H, *USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-9, D.I. 528 (S.D.N.Y. Dec. 19, 2013) (Transcript of Dec. 5, 2013 guilty plea).  In other words, Defendant Siegel knowingly and unlawfully "receive[d] … wire transfers in connection with receiving bets or wagers on sporting events or contests."  *Id.*

58.     On April 10, 2014, Defendant Siegel was sentenced to a term of probation for two years, with a special condition of three months of home detention, and 300 hours of community service.  Ex. I, *USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-9, D.I. 822 (S.D.N.Y. Apr. 11, 2014) (Judgment in a Criminal Case).  Defendant Siegel also was fined $21,000, and he forfeited $400,000 to the United States.  *Id.*

59.     On December 4, 2013, Defendant J. Hirsch pled guilty to Count Ten of the Indictment, transmission of sports wagering information, in violation of 18 U.S.C. § 1084.  *See USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-10 (S.D.N.Y. Dec. 4, 2013) (docket: "Minute Entry for proceedings held before Judge Jesse M. Furman:  Plea entered by Jonathan Hirsch (10) Guilty as to Count 10.").

60.     In conjunction with his guilty plea to Count Ten of the Indictment, Defendant J. Hirsch admitted that "from 2008 until early 2013, [he] worked as an employee of the Sports Betting Group based in Manhattan, and it was [his] job to keep track of the group's betting activity and to maintain [the] computers," and "[i]n the course of [his] employment, [he] routinely sent e-mails and text messages which contained the names of people or sports books against whom we were betting, the teams involved, the amounts of the bets, and whether the

group won or lost." Ex. J, *USA v. Tokhtakhounov et al.*, 1:13-cr-268-JMF-10, D.I. 508

(S.D.N.Y. Dec. 12, 2013) (Transcript of Dec. 4, 2013 guilty plea).

61.     On May 9, 2014, Defendant J. Hirsch was sentenced to a term of probation for

two years with 300 hours of community service.  Ex. K, *USA v. Tokhtakhounov et al.*, 1:13-cr-

268-JMF-10, D.I. 937 (S.D.N.Y. May 12, 2014) (Judgment in a Criminal Case).  Defendant J.

Hirsch also was fined $100, and he forfeited $80,600 to the United States.  *Id.*

62.     On October 16, 2013, Defendant N. Hirsch pled guilty to Count Fifteen of the

Indictment, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  *See USA v.*

*Tokhtakhounov et al.*, 1:13-cr-268-JMF-20 (S.D.N.Y. Oct. 16, 2013) (docket: "Minute Entry for

proceedings held before Judge Jesse M. Furman:  Plea entered by Jonathan Hirsch (10) Guilty as

to Count 15.").

63.     In conjunction with his guilty plea to Count Fifteen of the Indictment, Defendant

N. Hirsch admitted that "Between March 2012 and June 2012, [he] conspired with another to

defraud an individual by omitting material facts concerning the sale of a piece of art so that [he]

could profit from the sale.  In doing so, [he] used emails to send information about the painting

to that individual via interstate wire service.  Money was also transferred through interstate wire.

As a result, [he] received $25,000.  In [his] communications with the individual to whom [he]

sold the painting, [he] withheld material information about the economics of the transaction,

specifically, [his] financial interest in the sale."  Ex. L, *USA v. Tokhtakhounov et al.*, 1:13-cr-

268-JMF-20, D.I. 447 (S.D.N.Y. Nov. 14, 2013) (Transcript of Oct. 16, 2013 guilty plea).

64.     On February 25, 2014, Defendant N. Hirsch was sentenced to a term of probation

for two years with 300 hours of community service.  Ex. M, *USA v. Tokhtakhounov et al.*, 1:13-

cr-268-JMF-20, D.I. 676 (S.D.N.Y. Feb. 25, 2014) (Judgment in a Criminal Case).  Defendant N.

Hirsch also was fined $5,100, and he forfeited $25,000 to the United States.  *Id.*

## III.   As A Result Of The Indictment And Defendants' Attempt To Infiltrate LET, LET Cannot Raise Capital And Ceases Operations

65.   After Defendants Siegel, J. Hirsch, and N. Hirsch were indicted, it quickly

became plain to Mr. Schoenfelder that, in view of the Indictment, Defendants' investment in

LET, and the complexity and scope of the FBI's ongoing investigation, which was described in

emails by Special Agent Robert J. Hanratty, LET would not be able to raise additional capital

necessary to continue its operations.

66.   Mr. Schoenfelder faced repeated inquiries from potential investors concerning the

Indictment and Defendants' investment in LET.  These potential investors decided not to invest

in LET due to the Indictment and the cloud cast over LET by pending criminal charges against

significant LET investors.

67.   Mr. Schoenfelder also had to grapple with a restrictive right of first refusal

granted to LETIG in LET's Operating Agreement, and the fact that the FBI advised Mr.

Schoenfelder that it would not permit the indicted Defendants to authorize LET to raise

additional capital.

68.   The Indictment, Defendants' investment in LET, and Defendants' associated civil

conspiracy were the direct and proximate cause for the commercial failure of LET because LET

could not raise necessary capital to continue operations after Defendants' attempt to unlawfully

infiltrate and launder money through LET.

69.   On May 15, 2013, Mr. Schoenfelder told Defendant Steiner that LET could not

move forward given the cloud hanging over the company and that he would be resigning.

Defendant Steiner urged Mr. Schoenfelder to form a separate company, to circumvent the FBI's

supervision of the indicted Defendants' activities, so LET might raise the capital it needed. Defendant Steiner told Mr. Schoenfelder that LETIG would "settle up later."

70.     Given the demonstrated connection between Defendants Siegel, J. Hirsch, and N. Hirsch and organized crime, Mr. Schoenfelder did not want to be in a position where LETIG would just "settle up later."  Mr. Schoenfelder rejected Defendant Steiner's proposal and refused to lie to, or hide activities from, the FBI.

71.     By the end of May 2013, LET lacked the capital necessary to continue operations. The entire staff, including Mr. Schoenfelder and Mr. Jones, ceased all full-time employment at LET.  The following month, in June 2013, Mr. Schoenfelder officially stepped down from any active role with LET.

72.     The Indictment, Defendants' investment in LET, and Defendants' associated civil conspiracy thus imposed injury on Mr. Schoenfelder and all LET employees who believed in and were committed to LET's mission to address energy distribution infrastructure deficiencies in developing markets.

73.     In a June 4, 2013 email, Mr. Schoenfelder wrote to LET shareholders to update them on "the NY investor group issues."  Ex. N (June 4, 2013 email).  Mr. Schoenfelder explained that "we've reached a point where we can no longer go forward.  The investor group problems need to be resolved before anything else can happen.  Because there is no established time frame for this, and the FBI is estimating it will take as long as 2 years to resolve, the time has come for me to step down from any active role with the company."  *Id.*  Mr. Schoenfelder noted that "[a]ll of the engineers ha[d] already left and [he] was the last remaining full time person (but [he] stopped working in mid-May)."  *Id.*  Mr. Schoenfelder stated that LET's "materials and assets w[ould] be retained and stored at RIT somewhere."  *Id.*

74.     On July 15, 2013, Mr. Schoenfelder emailed Defendant Steiner and explained that

he had "moved on to some other unrelated opportunities" after he "stepped down from active

management" of LET.  *Id.* (July 15, 2013 email).  At no time did Defendant Steiner offer an

explanation that would permit LET or Mr. Schoenfelder to conclude that the funding or

investment in LET by either LETIG or HMS LLC originated from legitimate sources.

75.     On December 11, 2013, Mr. Schoenfelder emailed LET shareholders, including

LETIG and Defendants Siegel, J. Hirsch, N. Hirsch, Steiner, and Jeffrey.  Mr. Schoenfelder

explained how he intended to wrap up LET's operations, writing, *inter alia*:

> Following the cessation of operations in May, all of the company property has
> been in storage at RIT.  Without a resolution to the issues surrounding the first
> round investment and without any other path forward, it seems prudent to close
> down all of the company's operations in FY2013.
>
> The company has current cash totaling $3,027 and bills totaling $19,303.95 with
> deferred legal expenses comprising $18,736.63 of that total.  We have recently
> listed all of the remaining LET equipment on the eBay auction site and will
> hopefully sell those items in order to contribute towards payment of these
> deferred expenses.  The provisional patent we filed in November 2012 expired in
> November 2013 and would need to be refiled at an additional cost in order to have
> even marginal relevance.  Given the current financial situation, this doesn't seem
> possible.  We plan to securely destroy all physical prototypes that can't be sold
> for their components after the auction.  We would also like to pay the same
> accountant we used in 2012 to finalize the 2013 taxes so that we can cleanly cease
> operations after auctioning off remaining … pieces of equipment.  I have been
> personally negotiating with creditors and hope to resolve all outstanding matters
> as transparently as possible.
>
> …
>
> With all of this in mind I move to file the enclosed form with the Virginia State
> Corporation Commission to dissolve Local Energy Technologies, LLC as soon as
> I have sufficient votes.  I need to receive your vote by 5PM on Wednesday,
> December 17th.  If we are unable to achieve the required votes the corporation
> will naturally lapse and cease operations by default.  It would be preferable to
> more cleanly resolve the matter for those involved, especially in consideration of
> tax implications etc.
>
> In closing…thank you to everyone who invested their time, money, and energy in
> what we were trying to do at LET.  I still believe in the problem we saw, the
> solution we imagined, and the impact we wanted to have on the world.  It just

> wasn't meant to be this time.  In the words of Sir Winston Churchill, "Success is
> not final, failure is not fatal: it is the courage to continue that counts."

Ex. O (Dec. 11, 2013 email).

76.     On January 31, 2014, LET's corporate registration lapsed, and LET was cancelled by the Virginia Secretary of State.

77.     Mr. Schoenfelder later wrapped up LET's operations in the manner he described in his December 11, 2013 email to LET shareholders.

**IV.     Latch and LETIG's Baseless Allegations of Trade Secret Misappropriation**

78.     Latch is a Delaware corporation formed on February 5, 2014, after LET's corporate registration lapsed and after LET was cancelled by the Virginia Secretary of State.

79.     Mr. Schoenfelder first had the idea for the new type of access control system that grew into Latch in October 2013, after conversations with entrepreneurs and consultants about, among other things, home automation and cybersecurity.  Mr. Schoenfelder approached Mr. Jones with his idea, and Mr. Jones agreed to help develop the concept and technology.

80.     Today, Latch is at the forefront of a paradigm shift taking place in the way people access their apartments and homes.  Latch offers a fully integrated hardware and software solution for multi-family properties.  The Latch system provides keyless entry security systems that give property owners the ability to manage every door in a multi-unit building, and residents the ability to use a smartphone, keycard, or code to unlock their door, share temporary credentials with visitors and service providers, and enjoy unattended package delivery from UPS and other national carriers.

81.     The Latch system was launched in 2017 and has been very successful.  One in every ten new apartments depend on Latch devices to meet the needs of property managers and

residents.  On information and belief, LETIG learned of Latch's success and devised a plan to attempt to wrongfully lay claim to some of Latch's technology and value.

82.     On November 30, 2018, LETIG—driven by Defendant Steiner—began a campaign to shake down Latch.  LETIG sent Latch and LET letters containing allegations of wrongdoing, including allegations that Mr. Schoenfelder, Mr. Jones, and Latch misappropriated trade secrets under the Defend Trade Secrets Act and an unspecified state Uniform Trade Secrets Act.  In its letters, LETIG threatened litigation, writing, *inter alia*:  "We write you today to inform you of imminent litigation relating to LET which implicates Latch," and "You are now formally on notice of potential litigation."

83.     LETIG's allegations against Latch, Mr. Schoenfelder, and Mr. Jones are baseless. The form and function of Latch's proprietary technology is wholly different from the technology LET sought to develop.

84.     Latch's technology was designed to provide access control functionality for multi-unit buildings by allowing building owners to control access across their properties and residents to unlock doors using smartphones, key cards, and door codes.  In contrast, LET's technology was developed to help electricity-generating utilities in developing markets monitor electricity consumption, bill customers, and prevent energy theft from the hot wiring of electricity grids. There is no overlap between Latch's technology and LET's.

85.     Nevertheless, LETIG wrote in its November 30 letter to Latch:

From information that is now publicly available, it appears that the technology developed by Latch borrows much of its form and function from concepts developed while Messrs. Schoenfelder, Jones, [and another Latch employee] were employed by LET and financed by LET Investors.  Both LET and Latch developed remote hardware units with the ability to receive and transmit signals. Both also developed intellectual smartphone usage for payments and wifi sensor usage.  Each of these capabilities relies upon considerable intellectual property including trade secrets.

86.     No factual basis was provided for LETIG's conclusory allegation that "it appears that Latch has misappropriated trade secrets belonging to LET."

87.     On January 9, 2019, Latch and LETIG entered into a Tolling Agreement pursuant to which LETIG agreed "not [to] commence any legal proceedings against LATCH, including, but not limited to the filing of any complaint in court or with any administrative agency, prior to the termination of this Agreement."  Also on January 9, 2019, Mr. Schoenfelder and Mr. Jones entered into the same type of tolling agreement with LETIG.  The tolling agreements do not preclude Latch or Messrs. Schoenfelder and Jones from commencing legal proceedings.

88.     The tolling agreements were entered into due to a "desire to preserve the *status quo*" while the parties discussed LETIG's allegations.

89.     On April 16, 2019, Latch, Mr. Schoenfelder, and Mr. Jones sent LETIG a letter explaining in detail why LETIG's allegations are unfounded.  Among other things, the letter noted that LETIG failed to "specifically identify the confidential information allegedly taken or describe with any degree of particularity what the trade secrets might be."  The letter explained:

> [LETIG] appears to allege that the similarities between LET and Latch's technology include "remote hardware units that have the ability to receive and transmit signals," "smartphone usage for payments," and "wifi sensor usage." **But these purported functionalities are simply broad technology features that exist in billions of connected devices of innumerable use cases.  [LETIG] cannot claim that LET had an unfettered proprietary right in the concept of these basic technology principles**.

90.     The April 16 letter reiterated that "there is no connection between LET and Latch or their respective technologies" and promised that Latch, Mr. Schoenfelder, and Mr. Jones were "fully prepared to defend against [LETIG's] threatened legal claims."

91.     On July 9, 2019, LETIG sent Latch, Mr. Schoenfelder, and Mr. Jones notice of termination of the tolling agreements.  The tolling agreements will "remain in place through the

30th business date" after LETIG's notice of termination, "and shall thereafter expire on midnight of the 30th business date."

92.    LETIG's November 30 letters, subsequent related correspondence, the tolling agreements, and the notice of termination of the tolling agreements have created an actual, substantial, and immediate controversy warranting the issuance of declaratory judgments.

**COUNT ONE:**
**DECLARATORY JUDGMENT (28 U.S.C. § 2201) OF**
<u>**NO LIABILITY UNDER THE DEFEND TRADE SECRETS ACT**</u>

93.    Latch, Mr. Schoenfelder, and Mr. Jones repeat and reallege paragraphs 1 to 92 as if fully set forth herein.

94.    LETIG has alleged that Mr. Schoenfelder, Mr. Jones, and Latch misappropriated LET's trade secrets, and Latch, Mr. Schoenfelder, and Mr. Jones have a reasonable apprehension of being named as defendants in a lawsuit involving such a claim.

95.    Latch, Mr. Schoenfelder, and Mr. Jones never misappropriated any trade secrets of LET.

96.    LETIG's misappropriation claims are baseless.  LETIG alleges only that "[b]oth LET and Latch developed remote hardware units with the ability to receive and transmit signals [and] intellectual smartphone usage for payments and wifi sensor usage."

97.    To qualify as a trade secret under the Defend Trade Secrets Act, information must "derive[] independent economic value, actual or potential, from not being generally known."  18 U.S.C. § 1839.  Hardware that sends and receives signals, smartphones that facilitate payments, and WiFi sensors do not qualify as trade secrets because they were all well-known prior to LET's January 2012 formation.

98.    Under the Defend Trade Secrets Act, information cannot be a trade secret unless "the owner thereof has taken reasonable measures to keep such information secret."  18 U.S.C. §

1839.  On information and belief, LET did not take reasonable measures to maintain the secrecy of its information, including information concerning hardware capable of sending and receiving signals, smartphones that facilitate payments, and WiFi sensors.

99.  For example, and on information and belief, LET's Board was obligated to adopt policies governing non-competition, confidentiality, and the assignment of intellectual property within thirty days of the execution of LET's July 30, 2012 Operating Agreement, but LET never adopted any such policies.

100.  LET also disclosed to potential investors and publicly that its proposed hardware and software solutions for electricity-generating utilities in developing markets were going to use hardware capable of sending and receiving signals, smartphones that facilitate payments, and 2G/3G cellular communication devices.

101.  The Court should declare that, contrary to what LETIG claims, Latch, Mr. Schoenfelder, and Mr. Jones have not misappropriated LET's trade secrets and are not liable under the Defend Trade Secrets Act.

**COUNT TWO:**
**DECLARATORY JUDGMENT (28 U.S.C. § 2201) OF**
**NO LIABILITY UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT**

102.  Latch, Mr. Schoenfelder, and Mr. Jones repeat and reallege paragraphs 1 to 101 as if fully set forth herein.

103.  LETIG has alleged that Mr. Schoenfelder, Mr. Jones, and Latch misappropriated LET's trade secrets, and Latch, Mr. Schoenfelder, and Mr. Jones have a reasonable apprehension of being named as defendants in a lawsuit involving such a claim.

104.  Latch, Mr. Schoenfelder, and Mr. Jones never misappropriated any trade secrets of LET.

105.    LETIG's misappropriation claims are baseless.  LETIG alleges only that "[b]oth LET and Latch developed remote hardware units with the ability to receive and transmit signals [and] intellectual smartphone usage for payments and wifi sensor usage."

106.    To qualify as a trade secret under the Virginia Uniform Trade Secrets Act, information must "[d]erive[] independent economic value, actual or potential, from not being generally known."  Va. Code § 59.1-336.  Hardware that sends and receives signals, smartphones that facilitate payments, and WiFi sensors do not qualify as trade secrets because they were all well-known prior to LET's January 2012 formation.

107.    Under the Virginia Uniform Trade Secrets Act, information cannot be a trade secret unless it "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Va. Code § 59.1-336.  On information and belief, LET did not make reasonable efforts to maintain the secrecy of its information, including information concerning hardware capable of sending and receiving signals, smartphones that facilitate payments, and WiFi sensors.

108.    For example, and on information and belief, LET's Board was obligated to adopt policies governing non-competition, confidentiality, and the assignment of intellectual property within thirty days of the execution of LET's July 30, 2012 Operating Agreement, but LET never adopted any such policies.

109.    LET also disclosed to potential investors and publicly that its proposed hardware and software solutions for electricity-generating utilities in developing markets were going to use hardware capable of sending and receiving signals, smartphones that facilitate payments, and 2G/3G cellular communication devices.

110.    The Court should declare that, contrary to what LETIG claims, Latch, Mr. Schoenfelder, and Mr. Jones have not misappropriated LET's trade secrets and are not liable under the Virginia Uniform Trade Secrets Act.

**COUNT THREE:**
**DECLARATORY JUDGMENT (28 U.S.C. § 2201) OF**
**NO TRADE SECRET MISAPPROPRIATION UNDER NEW YORK LAW**

111.    Latch, Mr. Schoenfelder, and Mr. Jones repeat and reallege paragraphs 1 to 110 as if fully set forth herein.

112.    LETIG has alleged that Mr. Schoenfelder, Mr. Jones, and Latch misappropriated LET's trade secrets, and Latch, Mr. Schoenfelder, and Mr. Jones have a reasonable apprehension of being named as defendants in a lawsuit involving such a claim.

113.    Latch, Mr. Schoenfelder, and Mr. Jones never misappropriated any trade secrets of LET.

114.    LETIG's misappropriation claims are baseless.  LETIG alleges only that "[b]oth LET and Latch developed remote hardware units with the ability to receive and transmit signals [and] intellectual smartphone usage for payments and wifi sensor usage."

115.    To qualify as a trade secret under New York law, information must give the owner of the alleged trade secret an opportunity to obtain an advantage over competitors who did not know or use the information.  Hardware that sends and receives signals, smartphones that facilitate payments, and WiFi sensors do not qualify as trade secrets under this standard because they were all well-known prior to LET's January 2012 formation.

116.    To be a trade secret under New York law, information also must be the subject of reasonable measures taken to guard its secrecy.  On information and belief, LET did not take reasonable measures to maintain the secrecy of its information, including information concerning

hardware capable of sending and receiving signals, smartphones that facilitate payments, and WiFi sensors.

117.    For example, and on information and belief, LET's Board was obligated to adopt policies governing non-competition, confidentiality, and the assignment of intellectual property within thirty days of the execution of LET's July 30, 2012 Operating Agreement, but LET never adopted any such policies.

118.    LET also disclosed to potential investors and publicly that its proposed hardware and software solutions for electricity-generating utilities in developing markets were going to use hardware capable of sending and receiving signals, smartphones that facilitate payments, and 2G/3G cellular communication devices.

119.    The Court should declare that, contrary to what LETIG claims, Latch, Mr. Schoenfelder, and Mr. Jones have not misappropriated LET's trade secrets and are not liable for trade secret misappropriation under New York law.

### COUNT FOUR:
### VIOLATION OF RICO, 18 U.S.C. § 1962(a)

120.    LET and Mr. Schoenfelder repeat and reallege paragraphs 1 to 119 as if fully set forth herein.

121.    As alleged above, and on information and belief, Defendants Siegel, J. Hirsch, and N. Hirsch engaged in conduct (the running and activities of the Nahmad-Trincher Organization) of an enterprise (the Nahmad-Trincher Organization) through a pattern of racketeering activity and/or the collection of unlawful debts (e.g., multiple and repeated acts of gambling, money laundering, wire fraud, the transmission of wagering information, and the collection of extensions of credit by extortionate means).  Defendants LETIG, Siegel, J. Hirsch, and N. Hirsch (the "Count Four Defendants") received income derived, directly and indirectly,

through such unlawful activities—Defendants Siegel, J. Hirsch, and N. Hirsch received such income from their and the Nahmad-Trincher Organization's racketeering activities and unlawful collection of debts, and LETIG received at least a part of such income when Defendants Siegel, J. Hirsch, and N. Hirsch allocated $100,000 in HMS LLC's bank account for LETIG's investment in LET.

122.    As alleged above, and on information and belief, the Count Four Defendants directly or indirectly used or invested at least a part of their unlawfully received income to acquire an interest in, further establish and assist the operations of, and launder money through LET, an enterprise engaged in and conducting activities affecting interstate or foreign commerce—on behalf of all Defendants, $100,000 was wired from HMS LLC to LET on July 30, 2012, in exchange for 16,000 Class B units.

123.    As alleged above, and on information and belief, Defendants Steiner and Jeffrey were aware of Defendants Siegel, J. Hirsch, and N. Hirsch's unlawful activities but did nothing to stop them and failed to inform LET and Mr. Schoenfelder of such unlawful activities.

124.    LET and Mr. Schoenfelder were injured as a result of the Count Four Defendants' violation of 18 U.S.C. § 1962(a) and attempt to infiltrate and launder money through LET.

125.    After Defendants Siegel, J. Hirsch, and N. Hirsch were indicted, and as a result of LETIG's investment in and attempted infiltration of LET, LET was unable to raise capital, LET had to forgo the filing of its non-provisional patent application, LET's operations stalled, LET's employees left, and LET and Mr. Schoenfelder incurred costs and fees associated with the cessation of LET's operations, e.g., costs associated with storing and auctioning off assets and dealing with creditor calls and inquiries.

126.    The Count Four Defendants are jointly and severally liable to LET and Mr. Schoenfelder for actual damages, treble damages, costs, and attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT FIVE:
## VIOLATION OF RICO, 18 U.S.C. § 1962(d)

127.    LET and Mr. Schoenfelder repeat and reallege paragraphs 1 to 126 as if fully set forth herein.

128.    Defendants Steiner, LETIG, Siegel, J. Hirsch, N. Hirsch, and Jeffrey (the "Count Five Defendants") violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a).

129.    As alleged above, and on information and belief, Defendants Steiner, Siegel, J. Hirsch, N. Hirsch, and Jeffrey agreed to form LETIG to facilitate the investment in LET of at least a part of the unlawfully received income of Defendants Siegel, J. Hirsch, and N. Hirsch; and the Count Five Defendants agreed to wire at least a part of such income to LET, in the $100,000 wired to LET from HMS LLC's bank account.

130.    As alleged above, and on information and belief, Defendants Steiner and Jeffrey were aware of Defendants Siegel, J. Hirsch, and N. Hirsch's unlawful activities but did nothing to stop them and failed to inform LET and Mr. Schoenfelder of such unlawful activities.

131.    Indeed, on information and belief, Defendant Steiner was LETIG's decision maker, including with respect to LETIG's $100,000 investment in LET.

132.    LET and Mr. Schoenfelder were injured as a result of the Count Five Defendants' violation of 18 U.S.C. § 1962(d) and conspiracy to infiltrate and launder money through LET.

133.    After Defendants Siegel, J. Hirsch, and N. Hirsch were indicted, and as a result of the Count Five Defendants conspiring to violate 18 U.S.C. § 1962(a) and the overt acts taken to further that conspiracy (e.g., LETIG's investment in and attempted infiltration of LET), LET was

unable to raise capital, LET had to forgo the filing of its non-provisional patent application,

LET's operations stalled, LET's employees left, and LET and Mr. Schoenfelder incurred costs

and fees associated with the cessation of LET's operations, e.g., costs associated with storing and

auctioning off assets and dealing with creditor calls and inquiries.

134.    The Count Five Defendants are jointly and severally liable to LET and Mr.

Schoenfelder for actual damages, treble damages, costs, and attorneys' fees, pursuant to 18

U.S.C. § 1964(c).

## COUNT SIX:
## BREACH OF CONTRACT

135.    LET repeats and realleges paragraphs 1 to 134 as if fully set forth herein.

136.    On information and belief, LETIG and LET entered into a valid and enforceable

contract in conjunction with LETIG's investment of $100,000 in LET—specifically, a

Subscription Agreement.

137.    The Subscription Agreement states, *inter alia*:

> The Investor makes the following agreements, representations, declarations, acknowledgement and warranties, with the intent that they may be relied upon in determining the Investor's suitability as a purchase of Units: ….  Any information which the Investor has heretofore furnished to the Company, all information provided by the Investor herein and each representation and warranty made be the Investor in connection with the Investor's investment in the Units with respect to the Investor, the Investor's financial position and business experience is true, correct and complete as of the date of this Subscription Agreement….

*Id.* § 5(l).

138.    Before LETIG entered into the Subscription Agreement, Defendants Steiner,

Siegel, J. Hirsch, N. Hirsch, and Jeffrey, acting on behalf of LETIG, told Mr. Schoenfelder that

the funds LETIG was to invest in LET (the $100,000 from the HMS LLC bank account) were

obtained from a variety of business activities, including real estate and other investment activities

28

and the sale of an estate in France.  That information, on which LET relied, was not true, correct, and complete as required by the Subscription Agreement.  As alleged above, and on information and belief, at least a part of LETIG's $100,000 investment in LET was derived, directly and indirectly, through a pattern of racketeering activity and the collection of unlawful debts, and Defendants Steiner and Jeffrey were aware of Defendants Siegel, J. Hirsch, and N. Hirsch's unlawful activities but did nothing to stop them and failed to inform LET of such unlawful activities.  Defendant LETIG thus breached the Subscription Agreement.

139.    LET was injured as a result of LETIG's breach of the Subscription Agreement. After Defendants Siegel, J. Hirsch, and N. Hirsch were indicted, LET was unable to raise capital, LET had to forgo the filing of its non-provisional patent application, LET's operations stalled, LET's employees left, and LET incurred costs and fees associated with the cessation of LET's operations, e.g., costs associated with storing and auctioning off assets and dealing with creditor calls and inquiries.

140.    LETIG is liable to LET for damages for LETIG's breach of the Subscription Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    Declaratory judgment that Plaintiffs Latch, Luke Schoenfelder, and Brian Jones are not liable for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*;

B.    Declaratory judgment that Plaintiffs Latch, Luke Schoenfelder, and Brian Jones are not liable for trade secret misappropriation under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 *et seq.*;

C.      Declaratory judgment that Plaintiffs Latch, Luke Schoenfelder, and Brian Jones are not liable for trade secret misappropriation under New York law;

D.      Judgment that Defendants Siegel, J. Hirsch, N. Hirsch, and LETIG violated 18 U.S.C. § 1962(a);

E.      Judgment that Defendants Siegel, J. Hirsch, N. Hirsch, Steiner, Jeffrey, and LETIG violated 18 U.S.C. § 1962(d);

F.      Judgment that LETIG breached its Subscription Agreement with LET;

G.      An award of damages adequate to compensate LET and Mr. Schoenfelder for the statutory violations that have occurred, including prejudgment and post-judgment interest;

H.      An award of damages adequate to compensate LET for the breach of the Subscription Agreement, including prejudgment and post-judgment interest;

I.      An accounting and/or supplemental damages for all damages occurring after any discovery cutoff and through the Court's judgment;

J.      An award of attorneys' fees, including prejudgment interest on such fees;

K.      Costs and expenses of this action; and

L.      An award of any additional relief, in law and in equity, as the Court deems just and reasonable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all claims herein.

Dated: August 13, 2019                    Respectfully submitted,

                                          */s/ Maximilian A. Grant*
                                          Maximilian A. Grant
                                          LATHAM & WATKINS LLP
                                          885 Third Avenue
                                          New York, NY 10022
                                          Tel: (212) 906-1200
                                          max.grant@lw.com

                                          Christopher Henry
                                              *Pro Hac to be submitted*
                                          LATHAM & WATKINS LLP
                                          200 Clarendon Street, Floor 27
                                          Boston, MA 02116
                                          Tel: (617) 948-6000
                                          christopher.henry@lw.com

                                          *Attorneys for Plaintiffs*