UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
LATCHABLE, INC., LOCAL ENERGY
TECHNOLOGIES, LLC, LUKE SCHOENFELDER,
BRIAN JONES,

                      Plaintiffs,

       -against-

BEN STEINER, LET INVESTORS GROUP, LLC,
NOAH SIEGEL, JONATHAN HIRSCH, NICHOLAS
HIRSCH, GERARD JEFFREY,

                     Defendants.
---------------------------------------------------------------- X

CIVIL ACTION NO.: 19-cv-7575 (AT)(KNF)

**DEFENDANT'S ANSWER TO COUNTS ONE-THREE AND COUNTERCLAIM**

## COUNTERCLAIM

Defendants Ben Steiner, LET Investors Group, LLC ("LETIG"), Noah Siegel, Jonathan Hirsch, Nicholas Hirsch, and Gerard Jeffrey (collectively, "Defendants"), by and through their attorneys, answer Counts One through Three of the Complaint, and defendant LETIG, on behalf of Local Energy Technologies, LLC ("LET"; collectively with LETIG, "Counterclaim-Plaintiffs") and counterclaim against Latchable, Inc. ("Latch"), Luke Schoenfelder and Brian Jones (collectively, "Counterclaim-Defendants"), for trade secret misappropriation and other alleged misconduct, as follows:

## INTRODUCTION

1.     During the time relevant to this Counterclaim, Luke Schoenfelder and Brian Jones were, respectively, LET's President/CEO and lead hardware developer.

2.     Until its demise in January 2014, LET was a promising and innovative company using new remote access/control technologies.  LET initially created those technologies for use in the energy sector, allowing utility companies to, among other things, remotely activate and deactivate electricity meters, as well as monitor activity in geographical zones, and permitting

those meters to interact with the utility company's and its customers' platforms and devices. LET planned to broadly expand the reach of such technology into a variety of fields as the company grew.

3.    Messrs. Schoenfelder and Jones, however, betrayed LET, its employees, investors and members.  Schoenfelder and Jones secretly devised a plan to terminate LET and found a new technology company, Latch, out of its ashes.  Latch provides similar remote access control systems for use in the multi-unit commercial and residential sector.  Using similar interactive technologies developed for LET, tenants and other credentialed persons can use the Latch system to remotely lock and unlock doors in their buildings (akin to activating and deactivating electricity meters), and managers can control and monitor remotely such activity building-wide.

4.    To achieve their personal and financial ambitions, Schoenfelder and Jones misappropriated LET's technology, systems and software, including its source code, and used it to create Latch's technology. They also induced LET's key software and hardware developers to drop their responsibilities to LET and join Latch.  As a result of Schoenfelder's and Jones' misconduct, LET is defunct, and Latch, through its use of LET's trade secrets, received the head start necessary for it to become a now thriving company.

5.    One of Schoenfelder/Jones's and Latch's victims is LETIG, a company that is composed generally of a group of investors (including defendants Ben Steiner, Noah Siegel, Jonathan Hirsch, Nicholas Hirsch, and Gerard Jeffrey), whom Schoenfelder convinced to believe in him and be angel investors in LET.

6.    At a time when LET was in dire need of capital, LETIG invested $100,000 seed money in return for 16,000 Class B Units, (i.e. sixteen percent) of LET.   LETIG's investment

was a potentially game-changing boost at a critical time to LET, a company then barely six months old.

7.      Although none of the members of LETIG had specific expertise in the remote access control technologies that LET created and used, they were impressed with Mr. Schoenfelder and had faith in his commitment and dedication to the company.  Schoenfelder abused this trust in many ways.

8.      Schoenfelder and Jones actively sought to extricate themselves from LET.  In May 2013, Schoenfelder caused the termination of LET's employees and/or consultants, and advised Counterclaim-Plaintiffs that he was resigning from his duties to pursue what he deceptively told them were "unrelated" opportunities.  To justify his misconduct, Schoenfelder blamed certain members of LETIG who were indicted in April 2013 for allegedly participating in an unrelated purported gambling and art scheme, stating that potential investments in LET had dried up and would not be forthcoming as a result.

9.      Schoenfelder's justification for severing ties with LET was a sham.  Schoenfelder had a singular motive for blaming LETIG's members for LET's demise and for misrepresenting to LETIG that he was staying away from the technology field altogether – to  ensure that no interested party, including LETIG, might have cause to suspect that he and others were exploiting LET's trade secrets to create Latch for their personal benefit.

10.     Ultimately, on January 31, 2014, LET's corporate registration lapsed, and LET was cancelled by the Virginia Secretary of State.

11.     Yet, one month earlier, while LET was still an active company, Schoenfelder, Jones and Dhruva Rajendra, another founder of Latch, had filed a provisional application for a patent on behalf of Latch that replicated in large measure LET's proprietary system.  Then, just

three business days after LET's registration was cancelled, Schoenfelder registered Latch as a Delaware corporation.

12.     In the following years, both Jones and Schoenfelder operated Latch in secret, in what Latch itself has called "stealth mode."

13.     At the same time, Latch hired many of the same professionals who had designed LET's product and helped develop LET's hardware and source code and were available, some because they had been nominally terminated by Schoenfelder.

14.     LETIG and its members were kept completely in the dark of this misconduct.

15.     In August 2018, LETIG's members discovered that Schoenfelder had started the company Latch and determined that Schoenfelder, Jones and Latch likely engaged in serious acts of misconduct.  This lawsuit ensued shortly thereafter.

## FACTS

## LET AND LETIG'S INVESTMENT

16.     LET was a Virginia limited liability company, founded on January 31, 2012, with its principal place of business in Fairfax County, Virginia.  Its initial mission was providing remote access energy solutions, primarily in developing markets.  Later, LET planned to branch out globally into a host of different sectors.

17.     Schoenfelder was Co-Founder, Manager, Chairman, President and CEO of LET. Jones joined LET later as chief hardware developer.

18.     LET's technology, including a server and nodes which would communicate with each other in a mesh network, was designed to solve numerous problems, including monitoring energy usage, preventing energy waste and theft, permitting remote electricity connections and disconnections, and permitting remote pre-payments through as user's mobile devices.  LET

created software applications for this purpose, as well as certain hardware called the Dynamic Remote Energy Data Accessory ("DREDA"), which LET incorporated into the metering systems. The DREDA directly connected to a network using an onboard cellular modem.

19.     In early summer 2012, LET was actively seeking an early stage investor to fund the development of its product and services.

20.     In June 2012, Schoenfelder was introduced to certain individuals who later formed LETIG, including Noah Siegel, Jonathan Hirsch and Ben Steiner.   A group of childhood friends, the members were quickly impressed with the leadership and potential of LET and agreed to invest $100,000 for 16,000 Class B membership units (equaling 16% of the company) as its first angel investors. To facilitate the investment, these individuals created a limited liability company, LETIG, which was registered in Delaware on July 27, 2012.

21.     The LETIG members then pooled their monies together, and wired $100,000 to LET on or about July 30, 2012.

22.     LET and LETIG then signed a Subscription Agreement. LET and LETIG (and the other members of LET), moreover, entered into LET's Operating Agreement. Reflecting the huge importance of LETIG's investment to LET, the Operating Agreement provided LETIG with several protections, including veto rights over the sale of all of LET's assets or the dissolution of the company.

### LET'S PROMISING START

23.     On May 28, 2012, LET filed its first provisional patent application for its system that automatically connected and disconnected access to electricity based on a customer's billing status.

24.     On November 16, 2012, LET filed a second, expanded, provisional patent for a SERVICE PROVIDING SYSTEM, No. 61/737361, with the intention of filing multiple patent applications based on LET's inventions.

25.     In December 2012, LET completed a full international patent search, and prepared to submit its international Patent Cooperation Treaty applications.

26.     In December 2012, LET successfully initiated a pilot program in Haiti by installing its first five live DREDA units.

27.     With these achievements under its belt, LET began preparing documents seeking Series A investors for between $3.5 and $4.5 million.

28.     In materials directed to those potential investors, Schoenfelder projected revenues for years 2-6 of $7.77 million; $11.7 million; $19.4 million; and $32.4 million.  And, in an internal financial model, based on projections through LET's first six years, Schoenfelder estimated LET's implied enterprise value was $217,019,915.

29.     In March 2013, LET was preparing to file a non-provisional patent application for its SERVICE PROVIDING SYSTEM, No. 61/737361. Indeed, in investor-related materials, LET advised that a non-provisional patent application was filed in April 2013.

## SCHOENFELDER FORMS LATCH AND SHUTS DOWN LET

30.     As LET continued to develop its business, there were certain events that, in retrospect, suggest Schoenfelder's desire to terminate LET.

31.     In September 2012, Mr. Schoenfelder moved to London to pursue his studies for the 2012-13 academic year.  On information and belief, during this time, Mr. Schoenfelder's ability to successfully fulfill both his obligations to LET and to his scholarship program, were called into doubt.

32.     In addition, on or around December 2012, Mr. Schoenfelder, on information and belief, led the charge to terminate the employment of two vital LET members:  Ben Stukenborg, who was LET's lead software designer, and Adam Walker, LET's co-founder.

33.     Then, in early 2013, Schoenfelder, on information and belief, insisted on restructuring LET and changing its name to GridPotential, which was registered in Delaware on March 14, 2013.  Schoenfelder, on information and belief, then demanded that various software/hardware developers assign their rights to any inventions from LET to GridPotential.

34.     Soon thereafter, on information and belief, Schoenfelder determined to exclude LET entirely from his future plans.

35.     On information and belief, by at least July 2013, Schoenfelder and Latch's other co-founders Dhruva Rajendra and Jones were secretly working on the company that ultimately became Latch and seeking to divert LET's trade secrets to Latch.   On information and belief, through the Fall of 2013, Schoenfelder, Jones and Rajendra secretly worked on Latch's variant of LET's technology and prepared to file a provisional patent.

36.     As they turned their attention to Latch, Schoenfelder and Jones caught a break that gave them cover for their apparent duplicity and change of allegiance.

37.     Specifically, in April 2013, LETIG members N. Siegel, J. Hirsch, and N. Hirsch were indicted for conduct relating to allegedly illegal sports gambling and the sale of a painting. The New York Field Office of the FBI announced the indictments in a press release on April 16, 2013.  None of the counts in the indictment, though, concerned LETIG or LETIG's investment in LET in any way, nor was LETIG or LET mentioned in the press release.

38.     Nonetheless, on April 27, 2013, Schoenfelder, still living in London, informed Dave Muchow, General Counsel of LET, that he had just seen the press release for the

indictment and, upon Schoenfelder's expression of purported concern, Muchow reached out to the FBI that same day.

39.    Following email exchanges with the FBI's Special Agent Robert Hanratty directing the investigation, Muchow assured Hanratty on April 30, 2012 that "Per our conversation yesterday, I am pleased to confirm that my client Local Energy Technologies, LLC will continue to operate in the normal course of business …."

40.    On information and belief, Schoenfelder rejected the idea of "business as usual," however, because that would entail the continuance of LET.  Instead, Schoenfelder used the indictments as pretexts for his scheme to leave LET empty and to transfer LET's trade secrets to Latch.

41.    And, in fact, the indictments did not and would not have prevented LET from entering into any contracts, obtaining any investments, or otherwise continuing to operate.

42.    Thus, despite LET's general counsel's assurances of LET's continued vitality, on May 15, 2013, Schoenfelder hastily told Steiner that LET could not continue as a going concern and that he would be resigning.

43.    Next, on June 4, 2013, Schoenfelder sent LET shareholders an email in which he stated that all the engineers had left LET and that he had himself stopped working in mid-May. Schoenfelder blamed the demise of the company on the New York investor issues.

44.    Contrary to Schoenfelder's claim that the press release had made it impossible to obtain additional investment, on information and belief, Schoenfelder was at this time failing to return communications of interest from potential investors, rather than investors refusing his attempts to contact them.

45.     In addition, Schoenfelder was informed by members of LETIG that they had received expressions of additional interest from certain potential investors, which opportunity was ignored by Schoenfelder.

46.     On information and belief, there is no evidence that any potential investor that had agreed to provide, or had even expressed interest in, funding backed out based on the indictments of a few of the individuals who were members of the entity that had invested in LET.

47.     Schoenfelder refused all offers to address his claimed (albeit pretextual) concerns regarding the indictments and press release.

48.     On July 15, 2013, Schoenfelder emailed Steiner to say that he had "stepped down from active management of LET" and "moved to some other *unrelated* opportunities." (emphasis added).  Schoenfelder told Steiner that he would not continue as an entrepreneur working with startup companies but would instead work for an established company in finance or law.

49.     Finally, on December 11, 2013, Schoenfelder emailed LET members (or in LETIG's case, members of its member), copying Jones, seeking a vote authorizing the dissolution of LET.  Schoenfelder advised that the provisional patent LET had filed in November 2012 had already expired in November 2013 (without giving timely notice to LET's members) and that the remaining LET equipment had been listed for auction on eBay.

50.     But, by then, it had become even more clear that Siegel's, Jonathan Hirsch's and Nicholas Hirsch's role in the sports betting case announced in late April 2013 would have no impact on LET.  In October and December 2013, Siegel and Jonathan Hirsch pleaded guilty to a single count of transmission of sports wagering information, and Nicholas Hirsch to a single count of conspiracy to commit wire fraud with respect to a work of art.  All eventually received a

period of probation.  There had been no allegation of wrongdoing against LETIG members Steiner, Jeffrey, or LETIG itself.

51.     Nor, on information and belief, was there any evidence that at any point prior to that resolution or afterwards that any potential investor that had agreed to provide, or had even expressed interest in, funding had backed out based on the alleged indictments of a few individuals who were members of the entity that had invested in LET.

52.     As Schoenfelder knew, under the Operating Agreement LETIG had a Veto Right over the sale of all of LET's assets and any dissolution of the company. On December 17, 2013, LETIG informed Schoenfelder that it voted "NO" to the dissolution and sale, stating that it was "in everyone's best interest to understand the value of the IP so the best price can be achieved before any sale [is] effectuated."

53.     Yet, LETIG was never given an accounting of the value or the disposition of LET's intellectual property or other assets.

54.     Notwithstanding that the LETIG members voted against dissolution, on January 31, 2014, Schoenfelder willfully allowed the LET registration to lapse and LET was cancelled by the Virginia Secretary of State.

55.     Schoenfelder plainly had his own personal agenda for disregarding LET's and its members' bests interests.

56.     On January 4, 2014, while LET was still an active company, the Latch team had already filed its first provisional patent for A SYSTEM OF MULTI-UNIT REAL ESTATE MANAGEMENT, No. 61/923643.

57.     And, on February 5, 2014, only three business days after LET's registration was cancelled, Latch was incorporated in Delaware.

## LETIG DISCOVERS LATCH DESPITE ITS FRAUDULENT CONCEALMENT

58.     Schoenfelder did not inform any of the LETIG members that he was working on a business that involved technology substantially similar in many respects to that developed by, and proprietary to, LET.   Rather, he fraudulently concealed such fact.

59.     In late 2013, Schoenfelder personally met with individual members of LETIG to discuss LET, but he failed to disclose any information about Latch.  On the contrary he actively misled LETIG's members into believing that he was changing course to work in finance or law and had no further interest in participating in start-up technology companies.

60.     For several years thereafter, Latch developed its product relying, on information and belief, on LET's proprietary source code, hardware and systems. It also employed many of the same key personnel who designed the source code and systems for LET, including LET's former Chief Technology Officer, Ben Hood, and, later in 2017, LET's lead software developer, Ben Stukenborg, whose employment at LET Schoenfelder previously had terminated.

61.     For the first years after its incorporation, Latch was by its own admission in stealth mode. And, even when it started to seek recognition, it remained in development and attracted very little public attention.

62.     At that time, the LETIG members had moved on to other individual projects and had no reason to notice the company or suspect that LET's trade secrets had been misappropriated.  None of the members is involved in the technological aspects of Latch's industry, nor does any member have any reason to be aware of, or monitor, patent applications or publications in which Latch's technology may be disclosed.

63.     Thus, it was not until the late summer of 2018 that, after happening to read a report mentioning Latch and its founder Schoenfelder, LETIG's members first became aware of Latch and the close similarities between the products of LET and Latch.

64.     The technology used at both LET and Latch consists of a server and nodes which communicate in order to enable product delivery, remote access and monitoring, and data transmission and reporting.  Both technologies include remote hardware units placed at locations such as residences and businesses that can receive and transmit signals and interact to create a mesh network.  Both also incorporate smartphone usage for wireless sensor usage and use an online management portal to monitor and control the hardware components. Both provide web-based server software allowing administrators to monitor and control groups of deployed devices.

65.     These common elements -- along with (i) the pretextual abandonment of LET by Schoenfelder; (ii) Schoenfelder's and Jones' secret development of Latch while LET was still in existence; (iii) the host of key officers and employees specializing in the development of software and hardware in common between LET and Latch; (iv) Schoenfelder's attempt to dissolve LET and his choice not to prevent the lapse of LET's corporate registration <u>after</u> the filing of Latch's first provisional patent and <u>only days</u> before incorporating Latch – all convinced LETIG that Schoenfelder and Jones had likely misappropriated and used LET's trade secrets in creating and developing Latch.

66.     Indeed, even counsel for Counterclaim-Defendants subsequently conceded during the course of this action that an individual who has been exposed to trade secrets in one endeavor would inevitably disclose those secrets, even if unintentionally, when working in another similar field.   Counterclaim-Plaintiffs agree.

67.     Given these circumstances, LETIG immediately sought further information and assurances from Schoenfelder but received none.

68.     By letter dated November 30, 2018, LETIG demanded that LET provide access to records pursuant to Va. Code § 13.1-1028 and Section 5.4 of the Operating Agreement, and a derivative demand to take suitable action pursuant to Va. Code § 13.1-1042. LET did not agree to this demand.

69.     Specifically, LETIG demanded that "LET take suitable action against you, Luke Schoenfelder, and Brian Jones, including, but not limited to, (a) investigating your formation of a new company while LET was still in existence and the possibility that you used intellectual property developed by LET in your new venture and (b) bringing suit against Messrs. Schoenfelder and Jones and Latchable, Inc. for, *inter alia*, claims of fraud, breach of fiduciary duty of loyalty, usurpation of corporate opportunities, misappropriation of trade secrets, and breach of the Operating Agreement of LET."

70.     On January 9, 2019, LETIG, Schoenfelder, Jones, and Latch entered into a tolling agreement "relating to any legal claim possessed by LETIG or Local Energy Technologies, LLC as of the Effective Date of this Agreement, whether or not specifically referenced herein[.]"

71.     Thereafter, Schoenfelder and Jones refused to provide any information regarding LET to LETIG unless LETIG signed a confidentiality agreement and agreed to other protections that secured LET's source code.

72.     On March 20, 2019 at the insistence of Schoenfelder and Jones, LETIG executed a Confidentiality and Non-Disclosure Agreement, purportedly so that Schoenfelder could facilitate access to requested records of LET.

73.     Thereafter, Schoenfelder produced certain documents to LETIG, primarily marketing materials, and permitted a consultant hired by LETIG to inspect certain source code relating to LET. The source code was incomplete, had been stripped of important identifying information, and was made available under strictly limiting circumstances which prevented thorough analysis.

74.     On July 9, 2019, LETIG sent Latch, Schoenfelder and Jones notice of termination of the tolling agreements, effective thirty business days from the date of the notice.

75.     On August 13, 2019, Plaintiffs filed the Complaint in this action.

## COUNT ONE

### VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18. U.S.C. § 1836
### (Derivative Claim Against Counterclaim-Defendants)

76.     Counterclaim-Plaintiffs repeat and re-allege paragraphs 1-71 as if fully set forth herein.

77.     LET developed proprietary information, including remote control access systems, computer source code and software, and hardware, that constitute trade secrets under the Defend Trade Secrets Act.

78.     The proprietary information had economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

79.     LET's trade secrets were related to LET's products and services that were used in and were intended to be used in interstate and foreign commerce.

80.     LET took reasonable measures to keep its trade secrets secret, including requiring employees with access to such information to execute non-disclosure agreements, limiting third

party access to the information and requiring vendors, potential partners and investors to execute non-disclosure agreements, and investing in research tamper-proof devices to prevent reverse engineering of its technology.

81.     Schoenfelder and Jones knew that they owed LET a duty to maintain the secrecy of LET's trade secrets.  Indeed, on information and belief, both Schoenfelder and Jones entered into agreements containing non-disclosure and confidentiality covenants that prohibited them from using LET's trade secrets for the benefit of anyone other than LET or disclosing LET's trade secrets and other confidential information to third parties.

82.     On information and belief, Schoenfelder and Jones nevertheless disclosed LET's trade secrets, including its source code, software and remote access control systems, to Latch and its officers and employees, without LET's express or implied consent.  Schoenfelder, Jones and Latch then used and continues to use such trade secrets to the present day, on information and belief, to develop technology for Latch, knowing at the time of disclosure and use, that such trade secrets had been acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secrets and had been derived from a person who owed a duty to the LET to maintain the secrecy of the trade secret or limit its use.  See 18 U..S.C. § 1839(5)(B).

83.     Counterclaim-Defendants' misappropriation of LET's trade secrets was willful and malicious.

84.     As a proximate result of Schoenfelder's, Jones' and Latch's misappropriation, LET has suffered damages, including but not limited its actual loss, the unjust enrichment caused by the misappropriation, and a reasonable royalty for the unauthorized disclosure and use of LET's trade secrets.  See 18 U..S.C. § 1839(5)(B).

85.     In addition, LET is entitled to exemplary damages and its attorney's fees based on Counterclaim-Defendants' willful and malicious misappropriation.

## COUNT TWO

### MISAPPROPRIATION OF TRADE SECRETS (Va. Code § 59.1-336 et seq.)
### (Derivative Claim Against Counterclaim-Defendants)

86.     Counterclaim-Plaintiffs repeat and allege paragraphs 1-81 as if fully set forth herein.

87.     LET's intellectual property, including its proprietary remote access control systems, computer source code and software, and hardware, constitute trade secrets under the Virginia Uniform Trade Secrets Act (Va. Code § 59.1-336 et seq.) because it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

88.     LET took reasonable measures to keep its trade secrets secret, including requiring employees with access to such information to execute non-disclosure agreements, limiting third party access to the information and requiring vendors, potential partners and investors to execute non-disclosure agreements, and investing in research tamper-proof devices to prevent reverse engineering of its technology.

89.     Indeed, on information and belief, both Schoenfelder and Jones entered into agreements containing non-disclosure and confidentiality covenants that prohibited them from using LET's trade secrets for the benefit of anyone other than LET or disclosing LET's trade secrets and other confidential information to third parties.

90.     On information and belief, Schoenfelder and Jones acquired, disclosed and/or used LET's trade secrets, including its proprietary source code and software and remote access control systems, to develop technology for Latch   On information and belief, Latch has improperly used and continues to use such trade secrets for its own benefit.

91.     Schoenfelder, Jones and Latch knew or should have known that they had a duty to LET to maintain the secrecy of LET's trade secrets and/or that the trade secrets were acquired through improper means.

92.     LET did not expressly or impliedly consent to the acquisition, disclosure and use of LET's trade secrets by Schoenfelder, Jones, and Latch.

93.     Schoenfelder, Jones and Latch's misappropriation of trade secrets was willful and malicious.

94.     As a proximate result of Schoenfelder's, Jones' and Latch's conduct, LET has suffered damages, including but not limited to, the value of the trade secrets misappropriated, the amount by which Counterclaim-Defendants have been unjustly enriched, a reasonable royalty, direct damages, consequential damages, attorneys' fees and costs relating to this proceeding.

## COUNT THREE

### MISAPPROPRIATION OF TRADE SECRETS (New York Law)
### (Derivative Claim Against Counterclaim Defendants)

95.     Counterclaim-Plaintiffs repeat and allege paragraphs 1-90 as if fully set forth herein.

96.     LET's intellectual property, including its proprietary software and hardware, constitute trade secrets under the New York law because they constitute a formula, pattern,

device or compilation of information which was used in LET's business, and which give LET an opportunity to obtain an advantage over competitors who do not know or use them.

97.     LET expended considerable time, effort and monies in developing its trade secrets.

98.     LET's trade secrets gave it a considerable advantage over other companies in the energy and related sectors.

99.     LET took reasonable measures to keep its trade secrets secret, including requiring employees with access to such information to execute non-disclosure agreements, limited third party access to the information and requiring vendors, potential partners and investors to execute non-disclosure agreements, and invested in research tamper-proof devices to prevent reverse engineering of its technology.

100.    Indeed, on information and belief, both Schoenfelder and Jones entered into agreements containing non-disclosure and confidentiality covenants that prohibited them from using LET's trade secrets for the benefit of anyone other than LET or disclosing LET's trade secrets and other confidential information to third parties.

101.    On information and belief, Schoenfelder, Jones and Latch disclosed and/or used, and are using, LET's trade secrets in breach of an agreement with and/or a duty to LET, and/or as a result of unauthorized disclosure of those trade secrets.

102.    Schoenfelder and Jones concealed from Counterclaim-Plaintiffs that they were developing a product and service that appropriated LET's trade secrets.

103.    Schoenfelder's, Jones' and Latch's disclosure and/or use of LET's trade secrets gave Latch an opportunity to gain a competitive advantage over Latch's competitors.

104.     LET did not expressly or impliedly consent to the acquisition, disclosure and use of LET's trade secrets by Schoenfelder, Jones, and Latch.

105.     Schoenfelder, Jones and Latch's misappropriation of trade secrets was willful and malicious.

106.     As a proximate result of Schoenfelder's, Jones' and Latch's conduct, LET has suffered damages, including but not limited to, the value of the trade secrets misappropriated, a reasonable royalty, direct losses, consequential damages, attorneys' fees and costs relating to this proceeding.

## COUNT FOUR

**BUSINESS CONSPIRACY (Va. Code § 18.2-499 et seq.)**
**(Derivative Claim against Counterclaim-Defendants)**

107.     Counterclaim-Plaintiffs repeat and allege paragraphs 1-102 as if fully set forth herein.

108.     On information and belief, Schoenfelder, working with Jones and Latch, engaged in concerted action to injure LET's reputation, trade, business, or profession by acquiring and/or using LET's intellectual property without its authorization.

109.     Likewise, on information and belief, Schoenfelder, working knowingly and in cooperation with Jones and Latch, acted with legal malice to injure LET by acquiring and/or using LET's intellectual property and trade secrets without its authorization, in violation of their contractual obligations, fiduciary duties, and the Virginia Uniform Trade Secrets Act.

110.     As a proximate result of Schoenfelder's, Jones' and Latch's conduct, LET has suffered damages, including, but not limited to, the value of the trade secrets that they misappropriated, the amount by which they have been unjustly enriched, a reasonable royalty,

direct damages, consequential damages, treble damages, attorneys' fees and cost relating to this proceeding.

**COUNT FIVE**

**BREACH OF FIDUCIARY DUTIES**
**(Derivative Claim Against Luke Schoenfelder)**

111.    Counterclaim-Plaintiffs repeat and allege paragraphs 1-106 as if fully set forth herein.

112.    As the manager, Chairman, President, and CEO of LET, Schoenfelder owed a fiduciary duty under Virginia law.

113.    Schoenfelder breached his fiduciary duty to LET by misappropriating its trade secrets and intellectual property for the benefit of Latch.

114.    As a proximate result of Schoenfelder's conduct, LET has suffered damages, including but not limited to, the value of assets improperly disposed of, unjust enrichment, a reasonable royalty, direct damages, consequential damages, attorneys' fees and costs relating to this proceeding.

**COUNT SIX**

**UNJUST ENRICHMENT**
**(Derivative Claim Against Counterclaim-Defendants)**

115.    Counterclaim-Plaintiffs repeat and allege paragraphs 1-110 as if fully set forth herein.

116.    Schoenfelder, Jones and Latch misappropriated LET's proprietary information and trade secrets and have been enriched thereby.

- 20 -

117.    As investors in LET and owners of shares in LET, LETIG had an expectation to, and was entitled to the benefit of, LET's proprietary information and trade secrets.

118.    LETIG has been deprived of said benefit.

119.    It would be against equity and good conscience to permit Schoenfelder, Jones and Latch to retain said benefit at the expense of LETIG.

120.    LETIG is accordingly entitled to the value of the benefit Schoenfelder, Jones and Latch retained from the proprietary information and trade secrets.


## COUNT SEVEN

## BREACH OF CONTRACT AGAINST JONES
**(Derivative Claim)**

121.    Counterclaim-Plaintiffs repeat and allege paragraphs 1-116 as if fully set forth herein.

122.    On information and belief, Jones and LET entered into a non-disclosure agreement ("Jones NDA"), which contained confidentiality and non-disclosure covenants.

123.    The Jones NDA provided, among other things, that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████. The Jones NDA further provided that ████████████████████

████████████████████████████████████████████

████████████████████

124.    The Jones NDA was an enforceable agreement and LET performed such agreement fully.

125.     After being presented with the Jones NDA, Jones performed key services for LET and received payment for those services.

126.     Jones breached the Jones NDA by disclosing LET's proprietary intellectual property to Latch and other third parties, and by using such information for his and Latch's own personal benefit.

127.     As a proximate result of Jones' breach, LET has suffered damages in an amount to be determined at trial, including, but not limited to, the value of assets improperly disclosed and used and LET's direct damages.

## COUNT EIGHT

### BREACH OF CONTRACT AGAINST SCHOENFELDER
### (Derivative Claim)

128.     Counterclaim-Plaintiffs repeat and allege paragraphs 1-123 as if fully set forth herein.

129.     On information and belief, Schoenfelder and LET entered into a non-disclosure agreement ("Schoenfelder NDA"), made and effective January 18, 2012.

130.     The Schoenfelder NDA provided, among other things, that ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████     The Schoenfelder NDA further provided that ████████████

████████████████████████████████████████████████████████

██████████████████████████████████

131.     The Schoenfelder NDA was an enforceable agreement and LET performed such agreement fully.

132.    After being presented with the Schoenfelder NDA, Schoenfelder performed key services for LET and received payment for those services.

133.    Schoenfelder breached the Schoenfelder NDA by disclosing LET's proprietary intellectual property to Latch and other third parties, and by using such information for his and Latch's own personal benefit.

134.    As a proximate result of Schoenfelder's breach, LET has suffered damages in an amount to be determined at trial, including, but not limited to, the value of assets improperly disclosed and used and LET's direct damages.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Counterclaim-Plaintiffs respectfully request that the Court:

A.    Award Counterclaim-Plaintiffs their direct damages and consequential damages in an amount to be determined at trial;

B.    Award Counterclaim-Plaintiffs punitive and exemplary damages to the full extent permitted by law;

C.    Award Counterclaim-Plaintiffs, to the full extent permitted by law, their reasonable attorneys' fees and the costs incurred in bringing the federal Defend Trade Secrets Act claim, as well as the Virginia and New York law misappropriation of trade secret claims, and the Virginia business conspiracy claim;

D.    Award Counterclaim-Plaintiffs lost profits for LET or the disgorgement of profits from Latch;

E.    Award Counterclaim-Plaintiffs a reasonable royalty for the trade secrets misappropriated; and

F.      Award Counterclaim-Plaintiffs such other and further relief as the Court may deem appropriate.

## ANSWER AND AFFIRMATIVE DEFENSES

Defendants hereby answer Counts One through Three of the Complaint as follows:

1.      The allegations in Paragraph 1 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

2.      The allegations in Paragraph 2 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

3.      The allegations in Paragraph 3 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

4.      The allegations in Paragraph 4 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

5.      The allegations in Paragraph 5 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

6.      The allegations in Paragraph 6 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

7.      Defendants deny the allegations contained in Paragraph 7 of the Complaint.

8.      Defendants deny the allegations contained in Paragraph 8 of the Complaint, except admit that on November 30, 2018, LETIG sent Latch and LET letter alleging, among other things, that Latch, Jones and Schoenfelder misappropriated LET's trade secrets and refer the Court to the November 30, 2018 letters for a full and accurate recitation of their contents.

9.      Defendants state that Paragraph 9 of the Complaint purports to state conclusions of law for which no response is required.

10.    Defendants admit that the Complaint seeks declarations from this Court that Plaintiffs did not misappropriate trade secrets, and deny the remaining allegations in the Paragraph.

## NATURE OF THE ACTION

11.    Defendants admit that the Complaint seeks declarations from this Court that Plaintiffs did not misappropriate trade secrets under the referenced laws.

12.    The allegations in Paragraph 12 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

13.    The allegations in Paragraph 13 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

14.    The allegations in Paragraph 14 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

15.    The allegations in Paragraph 15 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

16.    Defendants admit, on information and belief, the allegations in Paragraph 16.

17.    Defendants admit the allegations contained in Paragraph 17.

18.    Defendants admit, on information and belief, the allegations contained in Paragraph 18.

19.    Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 19 that "Jones was employed by LET as a hardware consultant," and admit, on information and belief, the remaining allegation contained therein.

20.    Defendants deny the allegations in Paragraph 20 as of the date of this Answer.

21.    Defendants admit the allegations in Paragraph 21.

22.    Defendants admit the allegations in Paragraph 22.

23.    Defendants admit the allegations in the first sentence of Paragraph 23. The allegations in the rest of Paragraph 23 are subject to a pending motion to dismiss and therefore Defendants do not respond to those allegations at this time.

24.    Defendants deny the allegations in the first sentence of Paragraph 24 as of the date of this Answer. The allegations in the rest of Paragraph 24 are subject to a pending motion to dismiss and therefore Defendants do not respond to those allegations at this time.

25.    Defendants admit the allegations in the first sentence of Paragraph 25. The allegations in the rest of Paragraph 25 are subject to a pending motion to dismiss and therefore Defendants do not respond to those allegations at this time.

## JURISDICTION AND VENUE

26.    Defendants state that the allegations in Paragraph 26 purport to state conclusions of law with respect to jurisdiction, and therefore no response is required.

27.    Defendants state that the allegations contained in Paragraph 27 purport to state conclusions of law with respect to venue, and therefore no response is required.

28.    Defendants state that the allegations contained in Paragraph 28 purport to state conclusions of law with respect to venue, and therefore no response is required.  To the extent a response is required, denied.

29.    Defendants deny the allegations in Paragraph 29.

## FACTUAL BACKGROUND

30.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 30.

31.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

32.    Defendants admit the allegations in Paragraph 32 to the extent that it describes one of a host of LET's aims.

33.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 33.

34.    Defendants admit the allegations in Paragraph 34 as to all of the Defendants listed, except deny information or knowledge presently as to Jeffrey.

35.    Defendants deny the allegations in Paragraph 35.

36.    Defendants deny the allegations in Paragraph 36.

37.    Defendants deny the allegations in Paragraph 37.

38.    Defendants admit the allegations in Paragraph 38.

39.    The allegations in Paragraph 39 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

40.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

41.    Admit, on information and belief, the allegations in Paragraph 41.

42.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 42.

43.     The allegations in Paragraph 43 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

44.     The allegations in Paragraph 44 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

45.     The allegations in Paragraph 45 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

46.     The allegations in Paragraph 46 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

47.     The allegations in Paragraph 47 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

48.     The allegations in Paragraph 48 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

49.     The allegations in Paragraph 49 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

50.     The allegations in Paragraph 50 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

51.     The allegations in Paragraph 51 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

52.     The allegations in Paragraph 52 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

53.     The allegations in Paragraph 53 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

54.     The allegations in Paragraph 54 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

55.     The allegations in Paragraph 55 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

56.     The allegations in Paragraph 56 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

57.     The allegations in Paragraph 57 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

58.     The allegations in Paragraph 58 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

59.     The allegations in Paragraph 59 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

60.     The allegations in Paragraph 60 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

61.     The allegations in Paragraph 61 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

62.     The allegations in Paragraph 62 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

63.     The allegations in Paragraph 63 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

64.     The allegations in Paragraph 64 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

65.    The allegations in Paragraph 65 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

66.    The allegations in Paragraph 66 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

67.    The allegations in Paragraph 67 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

68.    The allegations in Paragraph 68 are subject to a pending motion to dismiss and therefore Defendants do not respond to this Paragraph at this time.

69.    Defendants deny the allegations in Paragraph 69, except admit that on or about May 15, 2013, Mr. Schoenfelder told Defendant Steiner that Mr. Schoenfelder would be resigning from LET.

70.    Defendants deny the allegations in Paragraph 70.

71.    Defendants deny the allegations in Paragraph 71.

72.    Defendants deny the allegations in Paragraph 72.

73.    Defendants deny the allegations in Paragraph 73, and respectfully refer the Court to the June 4, 2013 email for a full and accurate recitation of its contents.

74.    Defendants admit that the allegations in the first sentence of Paragraph 74 contain portions of the July 15, 2013 email and refer the Court to that document for a full and accurate recitation of its contents, and Defendants deny the allegations in the rest of that Paragraph.

75.    Defendants deny the allegations contained in Paragraph 75 of the Complaint, except admit that, on December 11, 2013, Schoenfelder emailed certain of the Defendants, as well as others, and that certain portions of such email are contained in the Paragraph, and

respectfully refer the Court to the December 11, 2013 email for a full and accurate recitation of its content.

76.     Defendants admit the allegations in Paragraph 76.

77.     Defendants deny the allegations contained in Paragraph 77.

78.     Defendants admit, on information and belief, the allegations in Paragraph 78.

79.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 79.

80.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 80.

81.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 81. Defendants deny the allegations in the rest of this Paragraph.

82.     Defendants deny the allegations in the Paragraph 82, except that admit that the allegations in this Paragraph contain select language from certain letters to Latch and LET and refer the Court to those letters for the language therein.

83.     Defendants deny the allegations in Paragraph 83.

84.     Defendants deny the allegations contained in Paragraph 84.

85.      Defendants deny the allegations contained in Paragraph 85, except admit that the Paragraph contains select language from the letter of November 30, 2018 and refer the Court to that letter for a full and accurate recitation of its contents.

86.     Defendants deny the allegations in Paragraph 86.

87.     Defendants admit the allegations in Paragraph 87.

88.     Defendants deny the allegations in Paragraph 88.

89.     Defendants deny the allegations in Paragraph 89, except admit that Paragraph 89 contains select language from the letter of April 16, 2019 and refer the Court to that letter for a full and accurate recitation of its contents.

90.     Defendants deny the allegations in Paragraph 90, except admit that Paragraph 90 contains select language from the letter of April 16, 2019 and refer the Court to that letter for a full and accurate recitation of its contents.

91.     Defendants admit the allegations in Paragraph 91 and that they contain select language from the notice of July 9, 2019 and refer the Court to that notice for the language therein.

92.     The allegations in Paragraph 92 constitute a legal conclusion and thus requires no response.

## COUNT ONE:  DECLARATORY JUDGMENT UNDER DTSA

93.     Defendants repeat and reallege their responses to Paragraphs 1-92 as if fully set forth herein.

94.     Defendants admit the allegations in Paragraph 94.

95.     Defendants deny the allegations in Paragraph 95.

96.     Defendants deny the allegations in Paragraph 96.

97.     To the extent that the allegations in Paragraph 97 constitute legal conclusions, Defendants are not required to respond. To the extent that the allegations in this Paragraph require a response, Defendants deny the allegations therein.

98.     To the extent that the allegations in Paragraph 98 constitute legal conclusions, Defendants are not required to respond. To the extent that the allegations in this Paragraph require a response, Defendants deny the allegations therein.

99.    Defendants deny the allegations in Paragraph 99.

100.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 100.

101.    The allegations in Paragraph 101 constitute legal conclusions and therefore no response is required.  To the extent a response is required, denied.

## COUNT TWO: DECLARATORY JUDGMENT UNDER
## VIRGINIA UNIFORM TRADE SECRETS ACT

102.    Defendants repeat and reallege their responses to Paragraphs 1-101 as if fully set forth herein.

103.    Defendants admit the allegations in Paragraph 103.

104.    Defendants deny the allegations in Paragraph 104.

105.    Defendants deny the allegations in Paragraph 105.

106.    To the extent that the allegations in Paragraph 106 constitute legal conclusions, Defendants are not required to respond. To the extent that the allegations in this Paragraph require a response, Defendants deny the allegations therein.

107.    To the extent that the allegations in Paragraph 107 constitute legal conclusions, Defendants are not required to respond. To the extent that the allegations in this Paragraph require a response,

108.    Deny the allegations in Paragraph 108.

109.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 109.

110.    The allegations in Paragraph 110 constitute legal conclusions and therefore no response is required.  To the extent a response is required, denied.

## COUNT THREE:  DECLARATORY JUDGMENT UNDER NEW YORK LAW

111.    Defendants repeat and reallege their responses to Paragraphs 1-110 as if fully set forth herein.

112.    Defendants admit the allegations in Paragraph 112.

113.    Defendants deny the allegations in Paragraph 113.

114.    Defendants deny the allegations in Paragraph 114.

115.    To the extent that the allegations in Paragraph 115 constitute legal conclusions, Defendants are not required to respond. To the extent that the allegations in this Paragraph require a response, Defendants deny the allegations therein.

116.    To the extent that the allegations in Paragraph 116 constitute legal conclusions, Defendants are not required to respond. To the extent that the allegations in this Paragraph require a response, Defendants deny the allegations therein.

117.    Defendants deny the allegations in Paragraph 117.

118.    Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 118.

119.    To the extent that the allegations in Paragraph 119 constitute legal conclusions, Defendants are not required to respond. To the extent that the allegations in this Paragraph require a response, Defendants deny the allegations therein.

## COUNT FOUR AND FIVE – VIOLATIONS OF RICO
## COUNT SIX – BREACH OF CONTRACT

120 - 140.    The allegations in Paragraphs 120 - 140 are subject to a pending motion to dismiss and therefore Defendants do not respond to these Paragraphs at this time.

## AFFIRMATIVE DEFENSES

As Counts Four, Five, and Six of the Complaint are subject to a pending motion to dismiss, Defendants do not list their affirmative defenses for those claims herein.

## FIRST AFFIRMATIVE DEFENSE

1.      Plaintiffs misappropriated LET's trade secrets.

## SECOND AFFIRMATIVE DEFENSE

2.      Plaintiffs fraudulently concealed that they had misappropriated LET's trade secrets.

## THIRD AFFIRMATIVE DEFENSE

3.      Plaintiffs' claims for declaratory relief should be dismissed as cumulative of Counterclaim-Defendants' misappropriation claims.

Dated:  March 4, 2020
        New York, New York

ROTTENBERG LIPMAN RICH, P.C.

By: _____
        Richard E. Rosberger
        Christopher J. Robinson
        Robert A. Freilich
The Helmsley Building
230 Park Avenue, 18th Floor
New York, New York 10169
(212) 661-3080
Attorneys for Defendants and Counterclaim-Plaintiffs